# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
**No. 21-1173V**

| | | |
|---|---|---|
| TAMARA E. MAYNARD, Petitioner, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | | Chief Special Master Corcoran<br>Filed: October 14, 2026 |

*Nathan Williams,* Bahe Cook Cantley & Nefzger, PLC, Louisville, KY, for Petitioner.

*Elizabeth Andary*, U.S. Department of Justice, Washington, DC, for Respondent.

## RULING ON ENTITLEMENT[1]

On April 8, 2021, Tamara E. Maynard filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Program").[2] ECF No. 1. Petitioner alleges that a hepatitis A vaccine administered to her on April 20, 2018, caused her to develop a shoulder injury related to vaccine administration ("SIRVA")—a Table claim (although she also alleges a causation-in-fact claim based on the same set of facts).

The case was originally assigned to the "Special Processing Unit" ("SPU"), since it alleges a commonly-settled Table claim, but was transferred out of SPU because of fact questions relating to several of the relevant Table elements. The parties subsequently offered expert reports, and have briefed the matter for resolution by ruling on the record. Petitioner's Motion, dated January 15,

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Ruling will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

2026 (ECF No. 42) ("Mot."); Respondent's Opposition, dated February 20, 2026 (ECF No. 43) ("Opp.").

Now, having reviewed the record, trial testimony, expert reports, and other briefing, I find the Table elements for a SIRVA claim are met, despite the evidence of comorbid medical issues that either are plainly unrelated to the SIRVA (in particular, Petitioner's wrist complaints), or parallel with it (degenerative or preexisting cervical radiculopathy). Petitioner is thus entitled to damages. But because much of Petitioner's treatment cannot be associated with her SIRVA (and also given the fact that the matter barely met the Act's "severity requirement"), an exceedingly modest damages award in this case is called for.

## I. Factual Background

Petitioner's pre-vaccination medical history includes bouts of left hip pain, headaches, and iron deficiency anemia. Ex. 2 at 35–36. Petitioner had no known history of shoulder injuries or complaints, however, Petitioner did have a slip and fall in 2017 where Petitioner struck the underside of her jaw on a tile floor, thus affecting her neck. Ex. 11 at 12. She reported a "stiffness" and a pain of 2/10. Ex. 10 at 54.

On April 20, 2018, Petitioner (then 49 years old) saw her primary care physician ("PCP"), Timothy Scott, M.D., and received a hepatitis A vaccine at Baptist Family Medicine at Tate's Creek in Lexington, Kentucky. Ex. 1 at 1–2; Ex. 2 at 33, 42, 55, 66, 76, 90, 103, 135, 151, 162, 178, 191, 209, 224, 251. Petitioner maintains the vaccine was administered in her right deltoid, but Respondent argues that a previous notation in the records state that the vaccine was actually administered in her "right vastus lateralis" (right thigh)—although that notation appears to have been corrected contemporaneously with the vaccination to "left deltoid." Ex. 2 at 33, 55, 66, 90, 103, 135, 178, 191, 209, 224, 251. There is no contemporaneous evidence of any immediate vaccine reaction.

Almost a month later (May 19, 2018), Ms. Maynard went to see her PCP, and reported that she had received a hepatitis A vaccine *the week before,* and in her *right* deltoid. Ex. 2 at 98. She noted "acute heaviness in the right arm" that had developed into moderately severe shoulder pain, weakness with use, a difficulty in elevating the arm and twisting her wrist when attempting to perform her work as a pharmacist, and some swelling and heat in the arm. *Id.*

A physical examination performed at this time revealed "swelling in the area of the superior deltoid area of the right shoulder," along with increased warmth and tenderness in the area. Ex. 2 at 99. Dr. Scott also noted pain at 90 degrees with abduction of the right arm, pain with posterior extension, decreased grip, and tenderness around the elbow. *Id.* Dr. Scott diagnosed Ms. Maynard with subdeltoid bursitis of the right shoulder joint, and treated it with a corticosteroid injection that Petitioner reported provided immediate relief. *Id.* at 99–100.

On June 12, 2018, Petitioner saw Janak Ramesh Talwalkar, M.D., at Baptist Health Medical Group Orthopedics and Sports Medicine, for treatment of right shoulder pain. Ex. 2 at 102. It was noted that Petitioner had tried to treat her own pain so far with over-the-counter Aleve, wearing an arm sling, and applying ice and heat to the area, but the pain continued to persist. *Id.* at 110. She again reported having pain in the right shoulder that started immediately after receiving a hepatitis A vaccine, and that was impacted by arm and wrist use. *Id*. Dr. Talwalkar diagnosed petitioner with lateral epicondylitis of right elbow or more colloquially referred to as "tennis elbow." *Id*. at 115. The assessment section of these records indicated that the "patient's shoulder seems to have recovered from her injection," that the injury was likely transient, and that in favoring the other shoulder, "she has likely created a[n] overuse situation with her right elbow." *Id*. Petitioner was instructed to make use of over-the-counter non-steroidal anti-inflammatory medication, was provided a wrist splint, and offered dedicated hand therapy. *Id.*

The next month, Petitioner returned to Dr. Talwalkar for a follow-up visit. Ex. 2 at 142. Petitioner tested negative for shoulder joint tenderness, strength and tone assessments were all five out of five, Hawkins-Kennedy impingement test was positive, and Neer impingement test was negative. *Id*. Dr. Talwalkar's assessment continued to be lateral epicondylitis of right elbow and right shoulder pain, and he recommended continued over-the-counter medication, but also physical therapy ("PT") and MRI imaging of Petitioner's right shoulder (and the MRI occurred around this time). *Id*. at 144.

On August 15, 2018, Petitioner saw Dr. Scott, again complaining of pain in her right arm plus a feeling that the arm had "dropped" and felt like dead weight. Ex. 2 at 158, 185. The MRI performed the month before showed diffuse supraspinatus tendinopathy with a four-millimeter mild, under-surface tear, and Dr. Scott's examination revealed tenderness of the right trapezius muscle extending into the right side of the neck and over the right deltoid. *Id*. Petitioner was diagnosed with a tear of the right supraspinatus tendon, tendonitis, and trapezius muscle spasm, and PT was again recommended (as well as possibly seeking a second opinion from a shoulder specialist). *Id*. at 186. Petitioner also saw Dr. Talwalkar again that same August, where it was reported Petitioner had to continue to wear a sling "from time to time." *Id.* at 200. He also diagnosed her with adhesive capsulitis, but noted that the MRIs revealed chronic/degenerative issues, and that issues relating to her cervical spine were likely complicating and exacerbating her symptoms. *Id*. at 190, 201.

On August 28, 2018, Ms. Maynard obtained a second opinion from Scott Mair, M.D., at University of Kentucky Sports Medicine. Ex. 3 at 2. She again stated that her pain began following a hepatitis A vaccine received in April, with immediate impact. *Id.* A review of the right shoulder MRI suggested to Dr. Mair "evidence of fluid within the humeral head consistent with possible injection into the marrow." *Id*. at 5. Dr. Mair opined that the vaccine was likely given into the

proximal humerus, causing her symptoms, and he prescribed a bone stimulator to increase bone healing. *Id.*

Petitioner returned to Dr. Talwalkar twice in the early fall of 2018. Ex. 2 at 216, 225, 250. At these visits, Dr. Talwalkar continued to recommend evaluation and care of Petitioner's cervical spine, given her reports of numbness and tingling in her right hand and her neck pain, although certain electrodiagnostic testing he recommended had not yet occurred. *Id.* And he provided her another steroid injection to her right shoulder joint. *Id.* And in October and November, Petitioner received a second dose of hepatitis A vaccine and an influenza vaccine, both in her left arm, and with no memorialized complications. *Id.* at 269, 277.

On November 15, 2018, Petitioner had appointments with both Drs. Mair and Talwalkar about her persistent right shoulder concerns. At her follow-up visit with orthopedist Dr. Mair, she reported ongoing pain and weakness and complained of mild burning pain, but mostly weakness at the shoulder, although her home efforts to improve her condition had helped. Ex. 3 at 7. Dr. Mair proposed PT (*Id.* at 9), while Dr. Dr. Talwalkar recommended "nerve studies and block to see if there is evidence of cervical root compression given her current symptoms." Ex. 2 at 306. Petitioner's shoulder concerns continued into December, and she followed up with Dr. Talwalkar. *Id.* at 313. He noted that the electrodiagnostic studies had yielded normal results, but exam suggested the lingering effects of right shoulder adhesive capsulitis, and he proposed another steroid injection along with use of over-the-counter medication. *Id.* at 322.

*2019 Treatment and Beyond*

Petitioner began PT in 2019, and saw Dr. Mair that February after she experienced increased pain in association with it. Ex. 3 at 13. Her shoulder symptoms thereafter improved (as reported to Dr. Mair in April 2019), but she now expressed additional complaints of bilateral elbow pain, cervical symptoms, and headaches. *Id.* A treatment plan of corticosteroid injection, anti-inflammatories, and activity modification was discussed. *Id.*

In May 2019, Petitioner saw James Bean, M.D., at Baptist Health Medical Group Neurosurgery for evaluation of neck pain and right-hand numbness. Ex. 6 at 51. She now noted that she had been experiencing neck pain on and off in the past, plus numbness and tingling in her hands and feet that lasted for three to four days and that was aggravated by driving or body position. *Id.* The results of an October 2018 computerized tomography ("CT") scan of her cervical spine were discussed at this time, and they had demonstrated degenerative cervical spine concerns. *Id.*

Thereafter, from the summer of 2021 to April 2022, Petitioner saw Jonathan Kark, M.D., at University of Kentucky Neurology four times for treatment of neck pain. Ex. 10 at 2, 8, 24, and

54. The visit records reference a neck injury related to a 2017 accident, but do not provide further information elaborating upon it. *Id.* at 54. Petitioner's primary concern at these visits appears to have been chronic neck pain and heaviness of the head, most often made worse in association with Petitioner's pharmacist work, and she was diagnosed with degenerative neck changes. *Id.* at 8, 24, 54. No records memorializing subsequent treatment have been filed in this matter.

## II. Expert Opinions[3]

### A. Petitioner's Expert – Dr. Michael A. Kuhn

Dr. Michael Kuhn is a board certified in Orthopaedic Surgeon who filed three expert reports on behalf of the Petitioner. Report, dated Mar. 21, 2025, filed as Ex. 12 (ECF No. 37-1) ("First Kuhn Rep."); Report, dated May 21, 2025, filed as Ex. 14 (ECF No. 38-1) ("Second Kuhn Rep."); Report, dated Oct. 31, 2025, filed as Ex. 15 (ECF No. 41-1) ("Third Kuhn Rep.")

Dr. Kuhn is a board certified in Orthopaedic Surgery with a subspecialty in Sports Medicine. Curriculum Vitae, dated Mar. 21, 2025, filed as Ex. 13 (ECF No. 37-2) at 2. He earned his Doctor of Medicine from the Uniformed Services University in Bethesda, Maryland. *Id.* at 1. From there, he underwent his Residency in Orthopaedic Surgery at the National Naval Medical Center before starting a Fellowship at the Arthroscopy Association of North America. *Id.* Dr. Kuhn has been retained as a clinical instructor and assistant team physician for multiple collegiate and national sports teams, and currently servs as a consultant for multiple Connecticut High School Athletic programs. *Id.* at 5. In addition to his work, Dr. Kuhn has written and published a handful of medical articles and research papers. *Id.* at 6–7.

*First Report*

Dr. Kuhn's first report mainly recited the facts and procedural history of this matter. *See* First Kuhn Rep. at 1–7. Dr. Kuhn's opinion is that the Petitioner sustained a SIRVA following her receipt of a hepatitis A vaccine. *Id.* at 7. He noted Petitioner's acute onset pain within 48 hours following the injection, without a prior history of pain, inflammation, or dysfunction of the right shoulder. *Id.* An MRI conducted after the vaccination failed to reveal any pre-existing structural cause that would account for Petitioner's symptoms. *Id.* at 8. The medical records also do not provide any further alternate explanation. *Id.* at 7–8. And the records also satisfy the other requisite criteria for a SIRVA, as the Petitioner experienced the pain for over six months. *Id.* at 8.

---

[3] Because I find the Table elements are met in this case, I do not include discussion of Expert's arguments relating to a causation-in-fact version of the claim.

*Second Report*

Dr. Kuhn submitted a supplemental report further explaining his determination that Petitioner suffered a SIRVA in her right arm. He concluded that Petitioner more likely than not received the vaccine in the right arm, despite records to the contrary. Second Kuhn Rep. at 1. All records following the vaccine note that it was administered into the right arm, and the MRI was performed on the right shoulder. *Id.* Petitioner's visits after the vaccination reported right arm heaviness, weakness, and elbow pain, and an inability to elevate that arm. *Id.* Petitioner also reported pain, spasms, and tenderness in the right trapezius muscle in the neck, which is consistent with overuse of the muscular region. *Id.* Further, the reported pain and documented limited range of motion were isolated to the right shoulder. *Id.*

Dr. Kuhn also reiterated that the vaccine was the cause of Petitioner's shoulder pain. Second Kuhn Rep. at 2. Petitioner did not have a history of pain, inflammation, or dysfunction of the right shoulder before the vaccine, and started experiencing symptoms after vaccine administration. *Id.* This resulted in pain and a reduced range of motion for that shoulder that affected her other muscles in that region that have no other identifiable explanation. *Id.*

*Third Report*

Dr. Kuhn's third report responded to the report from Respondent's expert, Dr. Paul Cagle, disagreeing with Dr. Cagle's opinion on the location of the vaccine's administration and the cause of Petitioner's injury.

With respect to vaccine administration situs, Dr. Kuhn acknowledged the record discrepancy about administration. Third Kuhn Rep. at 1. However, he contended that there was compelling evidence in the medical records to support Petitioner's contentions over the records suggesting a left side situs. *Id.* The post-vaccination medical records all note that the vaccine was administered in the right deltoid. *Id.* at 1–2. In addition, there is also reason not to trust the vaccine administration visit records. *See id.* at 1. The vaccine administration consent form was undated (which does not follow standard of care requirements), and a nurse did not administer the vaccine as the records indicated. *Id.*

Dr. Cagle's claim that Dr. Kuhn did not provide a mechanism or references for the Petitioner's injury is also unsupported, Dr. Kuhn contended. Third Kuhn Rep. at 2–3. Dr. Kuhn referenced his prior expert reports where he stated that the Petitioner's right shoulder pain and loss of range of motion was caused by her hepatitis A vaccine administered on April 20, 2018. *Id.* at 2. Further, Dr. Kuhn noted that he relies heavily on the medical records in this matter to support diagnosis and causation. *See id.* Petitioner's medical records show she experienced acute pain with the injection, suffered a loss in range of motion, there is no history of pain, inflammation, or

dysfunction of the shoulder before the injury, and there are no other identifiable conditions or abnormalities present to explain Petitioner's symptoms. *See id.* at 2–3.

Respondent further maintained that Petitioner's medical records showed symptoms not associated with shoulder injuries, and that Dr. Kuhn had failed to explain why Petitioner's cervical symptoms were not the cause of Petitioner's pain. Third Kuhn Rep. at 2–3. But abnormal symptoms in the medical record do not preclude a SIRVA finding, Dr. Kuhn argued. *Id*. Dr. Kuhn noted a decrease in Petitioner's grip strength at her May 19, 2018 visit. *Id.* While shoulder pain and injuries do not cause a decrease in grip strength, many shoulder injury patients over-rely on adjacent muscular regions (arm, neck, elbow) to compensate for their pain and loss in range of motion in the shoulder, Dr. Kuhn explained. *Id.* Therefore, the reduction in grip strength is not reason to dismiss a SIRVA diagnosis. *See id.*

Evidence of a potential cervical radiculopathy also could not fully explain the cause of Petitioner's injury or pain. Third Kuhn Rep. at 2–3. She was not initially experiencing those kinds of hallmark symptoms at the time of her presentation—cervical spine pain or tenderness, decreased range of motion in the cervical spine, changes to the arm in a dermatomal pattern, or a degenerative process. *Id.* It was not until the radiographs of the cervical spine and MRIs taken in 2021 and 2022 showed degenerative changes that cervical radiculopathy became a possible etiologic explanation for some symptoms. *Id.* at 3. And the presence of these degenerative changes does not even lead to cervical radicular findings in the majority of patients. *Id.* (citing S. Boden et al., *Abnormal Magnetic-Resonance Scans of the Cervical Spine in Asymptomatic Subjects: A Prospective Investigation,* 72 J. Bone Joint Surg. Am. 1178, (1990), filed as Ex. 15-A (ECF No. 41-2)).

In addition, the July 26, 2018, MRI findings of a partial rotator cuff tear and a bursal effusion do not fully explain Petitioner's symptoms, nor preclude a SIRVA diagnosis. Third Kuhn Rep. at 4. According to Dr. Kuhn, multiple studies have established that individuals over the age of 50 years old can have asymptomatic rotator cuff tears, with the tear risk only increasing with age. *Id.* (citing S. Tempelhof et al., *Age-Related Prevalence of Rotator Cuff Tears in Asymptomatic Shoulders,* 8 J. Shoulder Elbow Surg. 296, 297 tbl.1 (1999), filed as Ex. B (ECF No. 41-3) ("Tempelhof"); H. Minagawa et al., *Prevalence of Symptomatic and Asymptomatic Rotator Cuff Tears in the General Population: From Mass Screening in One Village,* 10 J. Orthop. 8, 9 (2013), filed as Ex. C (ECF No. 41-4) ("Minagawa"); J. Sher et al., *Abnormal Findings on Magnetic Resonance of Asymptomatic Shoulders,* 77 J. Bone Joint Surg Am. 10, 11–12 (1995), filed as Ex. D (ECF No. 41-5) ("Sher")). And what is clear is that symptoms (if any) that developed due to this tear only came on after the vaccination. *Id.*

Dr. Cagle's conclusion that Petitioner did not suffer a SIRVA, given Petitioner's MRI showing a mild inflammatory reaction on the right shoulder, contradicts the medical literature filed in this matter, Dr Kuhn contended. Third Kuhn Rep. at 4. Medical literature establishes that

SIRVA-affiliated inflammation decreases with time after vaccination. *Id.* at 4–5 (discussing P. Cagle, *Shoulder Injury After Vaccination: A symptomatic Review,* 56 Rev. Bras. Orthop. 299, 301 (2020), filed as Ex. E (ECF No. 41-6) ("Cagle 2020") (discussing a trend of bursitis inflammation and fluid buildup decreasing in SIRVA patients four to twelve months after vaccination)). The Cagle 2020 is a review article that assessed features of SIRVA. Cagle 2020 at 300. Dr. Cagle himself reviewed articles regarding MRI readings in SIRVA patients that found inflammation and fluid buildup two days post vaccination and a context of widespread inflammation, whereas an MRI taken five months later showed less inflammation. *Id.* at 301. Dr. Cagle interpreted these results to show a trend in decreasing post-vaccination overtime, and agreed that MRIs taken months after vaccination may not be an accurate method to assess or diagnose SIRVA based on his assessment. *Id.* Petitioner's MRIs were taken three months after vaccination, so it is likely that the "mild" inflammation Dr. Cagle observed had been greater closer in time to Petitioner's vaccination, and thus indicative of a SIRVA. Third Kuhn Rep. at 5.

Based on the evidence in this matter, Dr. Kuhn maintained, Petitioner has satisfied all required criteria for a Table SIRVA. Third Kuhn Rep. at 3–5. Petitioner has sufficiently shown through her medical records that she did not have a history of pain, inflammation, or dysfunction to the right shoulder prior to receiving the vaccine, nor does Petitioner have a confirmed condition or abnormality that would explain the Petitioner's symptoms. *Id.* at 3–4. Petitioner's pain started within 48 hours of receiving the vaccine. *Id.* at 3. Petitioner's pain and weakness were limited to her right shoulder, as there is no medical evidence of limitation of range of motion in the left shoulder or neck. *Id.*

B. <u>Respondent's Expert – Dr. Paul J. Cagle</u>

Dr. Cagle is, like Dr. Kuhn, an orthopedic specialist, and he filed a single written report for Respondent. Report, dated July 17, 2025, filed as Ex. A (ECF No. 39-1) ("Cagle Rep.").

Dr. Cagle graduated with his M.D. from Loyola University Stritch School of Medicine in Chicago, Illinois. Curriculum Vitae, dated July 31, 2025, filed as Ex. B (ECF No. 39-6) at 1. He then completed an Orthopaedic Surgery Residency at the University of Minnesota Academic Health Center and Medical School in Minneapolis, Minnesota before undergoing multiple Fellowships for elbow and shoulder surgery. *Id.* at 1–2. He served as an Assistant Professor in the Department of Orthopaedic Surgery at Southern Illinois University School of Medicine in Springfield, Illinois before receiving his board-certification in Orthopaedic Surgery. *Id.* After receiving his board-certification, he accepted a position as professor of Orthopaedic Surgery at the Icahn School of Medicine at Mount Sinai Hospital in New York City where he continues to teach today. *Id.* Alongside teaching, Dr. Cagle has served as a primary investigator for multiple studies/trials and has published over one hundred peer-reviewed articles. *Id.* at 3–18.

Dr. Cagle fundamentally disagreed with Dr. Kuhn's conclusions regarding Petitioner's injury, the likely vaccine administration location, and causation. Cagle Rep. at 10. Starting with location, Dr. Cagle pointed out that there were multiple discrepancies in Petitioner's medical record, with the location of the vaccination being revised from the right thigh to the left deltoid (and not subsequently corrected to the right shoulder, as Petitioner now alleges was the correct situs). *Id.* (citing Ex. 2 at 55). Although in Dr. Cagle's experience typographical errors in records can occur, there was no compelling evidence in the subsequent record to support the determination that Petitioner's vaccination occurred in the right shoulder. *Id.*

Dr. Cagle also denied that Petitioner suffered from a shoulder injury. Cagle Rep. at 10. A shoulder injury would not explain the decreased grip strength documented in Petitioner's May 19, 2018, visit. *Id.* Additionally, reported tenderness of the neck area and burning pain is atypical for shoulder injuries, but common for cervical and neck issues. *Id.* (citing Ex. 2 at 110, 185, 200). And the cause of Petitioner's pain could reasonably be attributed to factors unrelated to Petitioner's vaccine. *See id.* For instance, subsequent medical visits revealed that Petitioner had degenerative issues and cervical kyphosis (which could be associated with neck or shoulder pain). *Id.* (citing Ex. 2 at 216, 225, 306; Ex. 6 at 51). And Petitioner's neck pathology progressed to the point of requiring surgical intervention. *Id.* (citing Ex. 10 at 12–14).

There was also no range of motion loss documented. *See* Cagle Rep. at 11. At most, there was a reference to one event where the Petitioner reported not being able to raise her arm during a provider visit. *See id.* (citing Second Kuhn Rep. at 1). This reporting lacks the objective range of motion measurements that allow for a determination of any loss. *Id.* A patient simply stating they cannot lift their arm is not a confirmation of range of motion loss. *Id.* This lack of documentation is further cause to doubt a SIRVA injury. *Id.*

Turning to Dr. Kuhn's expert reports, Dr. Cagle expressed multiple issues with Dr. Kuhn's theories and explanations. *See* Cagle Rep. at 10–12. Dr. Kuhn's first report failed to provide a "viable mechanism or scientifically supported" theory for how the alleged SIRVA was brought on, did not explain why other present factors were not the cause of Petitioner's pain, and did not explain the MRI and physical evaluation findings. *Id.* at 10–11. Dr. Kuhn's second report also glossed over important medical findings. *See id.* Dr. Cagle noted that Dr. Kuhn's attempt to explain neck pain symptoms did not address Petitioner's degenerative changes to her cervical spine. *Id.* at 11. Dr. Kuhn's explanation was also unsupported by scientific references. *Id.* Dr. Kuhn's opinion also contradicted Dr. Cagle's observations in his own patients. *Id.* Dr. Cagle explained that he sees a few thousand patients with shoulder pain annually, and the pain that develops from using other muscle groups to compensate for loss in shoulder movement takes longer to develop than what was seen in the Petitioner. *Id.*

The requisite elements for a SIRVA require a showing of no history of pain of the affected shoulder, pain occurring in forty-eight hours after vaccination, pain and reduced range of motion are limited to the vaccinated shoulder, and no other condition or abnormality that could explain Petitioner's symptoms are present. Cagle Rep. at 12 (quoting 42 C.F.R. § 100.3(c)(10)). Dr. Cagle noted that the only documented onset of pain in Petitioner's medical records occurred on May 19, 2018, when Petitioner claimed her pain began a week prior—weeks after her vaccination. *Id.* (citing Ex. 2 at 96–100). In addition, Petitioner's shoulder was not fully evaluated until July 10, 2018, and the exam showed that Petitioner's range of motion fell within a "normal" range. *Id.* (citing Ex. 2 at 96–115, 142–44). The next shoulder evaluation on August 28, 2018, showed "full active range of motion" in her shoulder. *Id.* (citing Ex. 3 at 4). Petitioner was also noted wearing a sling which contributes to stiffness and loss of range of motion in joints, which could explain Petitioner's documented minor losses in shoulder motion—not a SIRVA. *Id.* at 12–13.

Other causes to doubt a SIRVA are Petitioner's neck pain and cervical degenerative changes. Cagle Rep. at 13. Dr. Cagle claimed there is clear evidence of an alternative pathology affecting Petitioner's neck that could explain her neck and shoulder pain, instead of compensatory muscle group use theory that Dr. Kuhn offered. *Id.* Petitioner's symptoms of loss of grip, burning pain, and limitation of function are inconsistent with an isolated shoulder injury in Dr. Cagle's opinion. *Id.* Dr. Cagle also opined that the medical record reveals evidence of chronic degenerative neck pathology that predates the Petitioner's vaccine. *Id.* Petitioner's partial rotator tear and small bursal effusion are evidence of this. *Id.* The rotator cuff tear likely predated the vaccination, as risk of asymptomatic rotator cuff tear increases in people over the age of fifty, and tears are an expected degenerative finding. *Id.* (citing Sher at 11–12; Tempelhof at 297 tbl.1; Minagawa at 9). Further, a small bursal effusion is inconsistent with a SIRVA, which would more commonly feature larger bursal effusions. *Id.* (citing Cagle 2020 at 301 ("early MRI findings after a SIRVA event correlated with inflammatory changes such as increased fluid, bursitis and tendinitis")).

## III. Procedural History

The Petition was filed in April 2021 and assigned to SPU. Respondent filed his Rule 4(c) Report defending this case in October of 2023. *See* ECF Nos. 31–33. Over a year later, in December of 2024, this case was transferred out of SPU and assigned to my Docket due to several fact questions pertaining to relevant Table elements. ECF Nos. 34–35. The parties subsequently offered expert reports, and have briefed the matter for resolution by ruling on the record. ECF Nos. 37–39, 41–43.

## IV. Parties' Arguments

*Petitioner*

Petitioner maintains that she has provided sufficient evidence to prevail on her theory that he suffered a SIRVA Table injury. Mot. at 4–14.[4]

As an initial matter, Petitioner claims she has shown that she received the hepatitis A vaccine in her right arm, despite contrary medical records she deems inaccurate. Mot. at 4–6. Petitioner acknowledges that her vaccination record initially reported her vaccine was delivered to her right thigh, and that this record was later changed to her left deltoid (but not the right). *Id.* at 4. In response, she notes that her medical records reveal she consistently stated to multiple providers that the vaccine was administered to her right shoulder. *Id.* at 5. The objective evidence also supports a right shoulder vaccination. *Id.* MRI evidence of the right shoulder showed proximal humeral bone bruise stress reaction, which is consistent with receiving an injection in that location. *Id.* (citing Ex. 3 at 5). Dr. Mair, Petitioner's treating provider who ordered the right shoulder MRI, stated that "it is likely that the injection was given to the proximal humerus and her symptoms are likely related to this." *Id.* (quoting Ex. 3 at 5). Petitioner's expert also determined that the records indicate that Petitioner more than likely received her vaccine in the right deltoid. *Id.* at 5–6.

With respect to the Table elements, Petitioner asserts that the record contains no evidence of pre-existing right shoulder pain, inflammation, or dysfunction that would explain her post-vaccination symptoms. Mot. at 7. Her onset, moreover, occurred immediately after vaccination and persisted, satisfying the 48-hour onset requirement. *Id.* at 7–8. Petitioner advised her treating providers that she had experienced pain, weakness, and tenderness in her right deltoid after receiving the vaccine. *Id.* at 7 (citing Ex. 2 at 98, 106, 110). Petitioner also consistently described her symptoms as starting from the time she received her hepatitis A vaccine. *Id.* at 8.

To the extent any records suggest otherwise, Petitioner contends that they reflect error or misinterpretation. Mot. at 7–8. Dr. Cagle misstated the medical record when he asserted it placed Petitioner's onset outside of the 48-hour window. *Id.* at 7 (citing Cage Rep. at 12). The record actually stated "the patient comes in today with a history of having received a hepatitis A vaccination in the right deltoid area approximately *1 week ago here at our office*." *Id.* (quoting Ex. 2 at 98 (emphasis added)). This was clearly a transcription error on the part of the provider, as the Petitioner unquestionably received her vaccination one *month* prior at the provider's office. *Id.* (citing Ex. 2 at 106, 110).

[4] Petitioner also included statements affirming she has satisfied general claim requirements of receiving a covered vaccine, experiencing residual effects beyond six months, and not receiving any compensation for her vaccine-related injury. Mot. at 14; Vaccine Act § 11(c)(1).

Petitioner also argues that any delay in treatment does not defeat a favorable onset showing. Mot. at 8. Petitioner delayed based upon the belief that her pain would subside on its own, which is not uncommon for SIRVA patients. *Id.* Only when this did not occur did she seek treatment—and only one month after her vaccination (hence a very small delay). *Id.*

Petitioner also claims it is clear from the medical records that her pain and limited range of motion were limited to her right shoulder, meeting the third SIRVA requirement. Mot. at 8. Petitioner complained of right shoulder pain during her first visit with Dr. Scott, who noted that Petitioner was "unable to elevate the [right] arm and [was] unable to curl her hair without pain." *Id.* (quoting Ex. 2 at 98). During her visit with Dr. Talwalkar, Petitioner reported pain in her right shoulder that radiated down to her elbow, continuous swelling at the injection site, and weakness in her right shoulder. *Id.* (citing Ex. 3 at 5). Respondent's contention that Dr. Talwalkar determined Petitioner's shoulder to have normal ROM is false. *Id.* at 9. Examination of Petitioner's shoulder showed limited internal rotation of the L4 vertebral level, and external rotation active range of 60 degrees (where normal external rotation is approximately 80 to 90 degrees). *Id.* (citing Ex. 2 at 143). Petitioner notes she also had a positive Hawkins–Kennedy impingement test that, when paired with her other results, corroborates a shoulder pathology that produces pain and limited range of motion. *Id.* (citing Ex. 2 at 142–44). Petitioner's treating providers also noted pain and reduced range of motion limited to her shoulder. *Id.* at 9–10.

Evidence of pain or concerns not specific to the shoulder should not preclude Petitioner from meeting this requirement. Mot. at 9–10. While the pain may have radiated to adjacent muscle groups, Petitioner's treating providers still opined that the pain originated in the shoulder area. *Id.* And SIRVA claims do not fail merely where there is other medical record evidence of non-shoulder issues. *Id.* (citing *Cross v. Sec'y of Health & Hum. Servs*., No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Dec. 2, 2022); *see also K.P. v. Sec'y of Health & Hum. Servs*., No. 19-0065V, 2022 WL 3226776, at *8 (Fed. Cl. Spec. Mstr. May 25, 2022)). Petitioner also pointed to Dr. Kuhn's report where he drew from his personal knowledge of treating patients with shoulder injuries who complained of pain both in and around the shoulder. *Id.* (citing Third Kuhn Rep. at 3).

Lastly, Petitioner contends that she has sufficiently shown that there is no alternative cause for her SIRVA injury. Mot. at 10–11. Petitioner received diagnostic tests that were negative for other causes that would explain her symptoms. *Id.* at 10. X-rays of the right shoulder revealed no acute osseous findings, EMG nerve conduction studies were reported as normal, and Dr. Kuhn did not identify objective medical findings in the record that would explain Petitioner's symptoms. *Id.* (citing Ex. 2 at 321–22; Ex. 3 at 19–20; Third Kuhn Rep. at 4).

Dr. Cagle's arguments that a degenerative disorder better explain Petitioner's injury are not persuasive, Petitioner argues. Mot. at 10–11. The evidence of a partial rotator cuff tear and

"small bursal effusion" that Respondent relies on do not undermine the existence of a SIRVA injury. *Id.* Rotator cuff tears are not attributable to SIRVA injuries, but are rather unmasked when treating SIRVAs. *Id.* at 10 (quoting *Doe v. Sec'y of Health & Hum. Servs.*, No. 20-1317V at 6 (Fed. Cl. Spec. Mstr. Jan. 10, 2025). To the extent the tear preceded vaccination, it was asymptomatic and there is no record of pain associated with it. *Id.* The "small bursal effusion" also does not undermine a SIRVA diagnosis, as both Dr. Kuhn and Dr. Cagle reference articles that show bursal effusion naturally decreases with time after vaccination. *Id.* at 10–11 (citing Cagle 2020 at 301).

*Respondent*

Respondent argues that Petitioner has not preponderantly shown the vaccine was likely administered in her right shoulder, and cannot otherwise satisfy the elements of a Table claim. Opp. at 13–17.

With respect to situs, Respondent notes that Petitioner's vaccination record originally stated the vaccine was administered into Petitioner's right thigh, but was corrected a minute later to left shoulder. Opp. at 13 (citing Ex. 2 at 33, 55). The swift revision is evidence that the vaccine document was not a pre-filled form, but a contemporaneously-recorded medical document that was corrected for accuracy (and thus warrants more weight). *Id.* Petitioner's reliance on subsequent, self-reported right shoulder pain to her treating providers is misplaced, as the medical records themselves should be given greater probative weight. *Id.* at 13–14. In addition, Petitioner lacks other evidence undermining the reliability of the vaccination record. *Id.* at 14.

Next, Respondent argues that Petitioner has not satisfied multiple requisite elements for a Table SIRVA claim, including showing that pain and reduced range of motion were not limited to the vaccinated shoulder, and that no other condition or abnormality is present that would explain the patient's symptoms. Opp. 14–17.

Petitioner complained multiple times of pain and symptoms outside of her right shoulder. Opp. at 14. Twenty-nine days after vaccination, Petitioner reported weakness and pain with arm use and was unable to twist her wrist. *Id.* at 14–15 (citing Ex. 2 at 98). Fifty-two days after vaccination, Petitioner reported to an orthopedist that she struggled with "forceful gripping and twisting of her wrist and forearm." *Id.* at 15 (citing Ex. 2 at 110). Even Dr. Talwalkar noted that Petitioner's shoulder "seem[ed] to have recovered from her injection" upon finding deltoid strength and sensation were intact after physical examination. *Id.* (citing Ex. 2 at 115). Although, Petitioner continued to report elbow pain afterwards. *Id.* (citing Ex. 2 at 132).

Respondent especially highlights evidence of Petitioner's reports of neck pain beginning roughly four months after vaccination. *See* Opp. at 15. Dr. Talwalkar opined that the neck pain

was contributing to the shoulder pain, and resolving the former would aid the latter. *Id.* (citing Ex. 2 at 201). In addition, as Dr. Cagle noted, there is clear evidence of neck pathology in the medical records and this is "inconsistent with an isolated shoulder process." *Id.* (citing Cagle Rep. at 13).

Petitioner also did not exhibit reduced range of motion in the vaccinated shoulder. Opp. at 15. As Dr. Cagle noted in his report, Petitioner exhibited normal range of motion upon exam on both July 10 and August 28, 2018. *Id.* (citing Ex. 2 at 142–44; Ex. 3 at 2–6; Cagle Rep. at 12–13). It was only when Petitioner started using an unprescribed sling for her right arm that she began to exhibit range of motion deficits. *Id.* (citing Ex. 2 at 12–13). In Dr. Cagle's opinion, using a sling immobilized her shoulder and likely led to a range of motion deficit not present before. *Id.* (discussing Cagle Rep. at 12–13).

Lastly, Respondent argues that Petitioner suffers from other conditions or abnormalities that explain her symptoms, specifically relating to the neck. Opp. at 16–17. Petitioner's medical history includes a slip and fall in 2017, where Petitioner struck the underside of her jaw on a tile floor, thus affecting her neck. *Id.* at 16 (citing Ex. 10 at 54; Ex. 11 at 12). Petitioner's records also show objective evidence of a small bursal effusion and a small partial rotator cuff tear. *Id.* Both are more consistent with a degenerative neck pathology than a SIRVA. *Id.* (discussing Cage Rep. at 13). Petitioner's treating providers even went so far as to suggest surgery to assist with Petitioner's neck degeneration. *Id.* (citing Cagle Rep. at 13; Ex. 10 at 14).

## V. Applicable Legal Standards

### A. *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[5] Petitioner alleges a Table and causation-in-fact claim.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that

[5] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs*., 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health and Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each *Althen* prong requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Hum. Servs.*, 121 Fed. Cl. 230, 245 (May 6, 2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)).

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone v. Sec'y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025) (the argument that *Althen* prong one requires only a showing of plausibility "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Kalajdzic v. Sec'y of Health & Hum. Servs.*, No. 2023-1321, 2024 WL 3064398, at *2 (Fed. Cir. June 20, 2024) (arguments "for a less than preponderance standard" deemed "plainly inconsistent with our precedent" (*citing Moberly*, 592 F.3d at 1322)); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *aff'd*, 2024 WL 2873301 (Fed. Cir. June 7, 2024) (unpublished). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant*, 956 F.2d at 1148. In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs*., 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious

for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for rev. den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked

propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later

testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

C. *Analysis of Expert Testimony*

Establishing a sound and reliable medical theory often requires a petitioner to present expert testimony in support of his claim. *Lampe v. Sec'y of Health & Hum. Servs*., 219 F.3d 1357, 1361 (Fed. Cir. 2000). Vaccine Program expert testimony is usually evaluated according to the factors for analyzing scientific reliability set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594–96 (1993). *See Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1339 (Fed. Cir. 2010) (citing *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999). Under *Daubert*, the factors for analyzing the reliability of testimony are:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Terran*, 195 F.3d at 1316 n.2 (citing *Daubert*, 509 U.S. at 592–95).

In the Vaccine Program the *Daubert* factors play a slightly different role than they do when applied in other federal judicial settings, like the district courts. Typically, *Daubert* factors are employed by judges (in the performance of their evidentiary gatekeeper roles) to exclude evidence that is unreliable or could confuse a jury. By contrast, in Vaccine Program cases these factors are used in the *weighing* of the reliability of scientific evidence proffered. *Davis v. Sec'y of Health & Hum. Servs*., 94 Fed. Cl. 53, 66–67 (2010) ("uniquely in this Circuit, the *Daubert* factors have been employed also as an acceptable evidentiary-gauging tool with respect to persuasiveness of expert testimony already admitted"). The flexible use of the *Daubert* factors to evaluate the persuasiveness and reliability of expert testimony has routinely been upheld. *See, e.g.*, *Snyder*, 88 Fed. Cl. at 742–45. In this matter (as in numerous other Vaccine Program cases), *Daubert* has not been employed at the threshold, to determine what evidence should be admitted, but instead to determine whether expert testimony offered is reliable and/or persuasive.

Respondent frequently offers one or more experts in order to rebut a petitioner's case. Where both sides offer expert testimony, a special master's decision may be "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe*, 219 F.3d at 1362). However, nothing requires the acceptance of an expert's conclusion "connected to existing data only by the *ipse dixit* of the expert," especially if "there is simply too great an analytical gap between the data and the opinion proffered." *Snyder*, 88 Fed. Cl. at 743 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 146 (1997)); *see also Isaac v. Sec'y of Health & Hum. Servs.*, No. 08–601V, 2012 WL 3609993, at *17 (Fed. Cl. Spec. Mstr. July 30, 2012), *mot. for review den'd*, 108 Fed. Cl. 743 (2013), *aff'd*, 540 F. App'x. 999 (Fed. Cir. 2013) (citing *Cedillo*, 617 F.3d at 1339). Weighing the relative persuasiveness of competing expert testimony, based on a particular expert's credibility, is part of the overall reliability analysis to which special masters must subject expert testimony in Vaccine Program cases. *Moberly*, 592 F.3d at 1325–26 ("[a]ssessments as to the reliability of expert testimony often turn on credibility determinations"); *see also Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1250 (Fed. Cir. 2011) ("this court has unambiguously explained that special masters are expected to consider the credibility of expert witnesses in evaluating petitions for compensation under the Vaccine Act").

D. *Determination of Claim on Basis of Record*

I have opted to decide entitlement in this case based on written submissions and evidentiary filings, including the expert reports filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See D'Toile v. Sec'y of Health & Hum. Servs.*, No. 15-85V, 2018 WL 1750619, at *2 (Fed. Cir. Apr. 12, 2018); *see also Hooker v. Sec'y of Health & Hum. Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *See Hovey v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 397, 402–03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417.

## ANALYSIS

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which

the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a covered vaccine (a category including the version of the flu vaccine at issue). 42 C.F.R. § 100.3(a)(XIV)(B). All criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") must be met to prevail, and they are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
> (ii) Pain occurs within the specified time-frame;
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

*Situs*

A preliminary issue to be resolved is whether the Petitioner likely received the hepatitis A vaccine in her left or right shoulder. While the initial vaccination administration record states the vaccine was administered in her left shoulder, preponderant evidence supports a right-sided administration. That evidence includes the fact that Petitioner sought treatment within a month of vaccination, reporting pain in her vaccinated right shoulder. Ex. 2 at 98. She also thereafter repeatedly associated her injury with a right-sided vaccination. *See id.* at 98, 102, 110, 158, 185,

311–13; Ex. 3 at 2, 7. And there is no other evidence (beyond the initial vaccination record) suggesting a left-sided vaccination.

This is certainly not the first time that the Program has faced a factual issue like this—a conflict between the initial vaccination record and other evidence—and found preponderant evidence that the record was likely inaccurate, even though it is the first/"official" proof of administration. *See, e.g.*, *Hanna v. Sec'y of Health & Hum. Servs*., No. 18-1455V, 2021 WL 3486248, at *13 (Fed. Cl. Spec. Mstr. July 15, 2021) (finding that Petitioner's contemporaneous medical records, supported by sworn witness statements, were preponderant evidence that the vaccine was administered into Petitioner's right arm, contrary to the vaccine administration record); *Mezzacapo v. Sec'y of Health & Hum. Servs*., No. 18-1977V, 2021 WL 1940435, at *6 (Fed. Cl. Spec. Mstr. Apr. 19, 2021) ("[a]lthough the Rite Aid immunization summary contained in petitioner's medical records states that petitioner received his Tdap and flu vaccinations in the left arm . . . the record as a whole indicates otherwise.") (internal citations omitted); *Mogavero v. Sec'y of Health & Hum. Servs*., No. 18-1197V, 2020 WL 4198762, at *3 (Fed. Cl. Spec. Mstr. May 12, 2020) (finding that Petitioner's vaccination administration record memorialized the incorrect arm based on Petitioner's post-vaccination medical records).

Respondent makes a reasonable argument that the actual administration record's trustworthiness is bolstered by the fact that it was edited contemporaneously (allowing for the inference that it would have precisely indicated the actual situs). But medical records are not free from human error, as they "are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Hum. Servs.*, No. 03-1192V (Fed. Cl. Spec. Mstr. July 18, 2006). And it is common in Program cases for the situs record to be incorrect—even likely here, when the edit only served to indicate an arm rather than thigh was the locus. Ultimately, the fact that the Petitioner was treated in her right arm; that this was the location of her complaints; and that she recalled a right-sided vaccination, are all matters that outweigh the initial record. The totality of evidence supports Petitioner's situs contentions.

*Onset*

The second issue raised by Respondent is whether Petitioner's first post-vaccination symptom or manifestation of onset (specifically pain) of her shoulder injury occurred within 48 hours of her vaccination, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI). Based upon a review of the entire record, I find that Petitioner has met this Table requirement as well.

Respondent does not formally dispute that Petitioner experienced shoulder pain within forty-eight hours after vaccination in his Opposition Brief, but Dr. Cagle addressed it in his report.

*See generally* Opp.; Cagle Rep. at 12. Petitioner's first medical treatment record does inaccurately state that she received the vaccine "in the right deltoid area approximately *1 week ago* here at our office." Ex. 2 at 98. But this is facially incorrect, as Petitioner received her vaccine one *month* ago at that provider's office. *See id.* at 33. In addition, Petitioner complained to her treating providers that she experienced "acute pain with the injection," and continuously echoed she experienced pain immediately after receiving her hepatitis A vaccine. *See id.* at 98, 110; Ex. 3 at 2.

Admittedly, the record is not consistently precise as to the specific moment of onset, but this does not preclude a favorable finding. The Act does not require that medical records document an exact date and time for the onset of a petitioner's shoulder pain. And a special master may thus find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). Arguments that a petitioner has not satisfied this requirement due to not seeing or reporting pain to a provider within 48 hours of vaccination are also unpersuasive. As I have previously observed, "the Vaccine Act clearly does not require that symptoms be recorded within a specific timeframe to be preponderantly established. Rather, it requires only that onset *occurs* in the relevant timeframe." *Niemi v. Sec'y of Health & Hum. Servs*., No. 19-1535V, 2021 WL 4146940, at *4 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (citing Section 13) (emphasis in original).

*Existence of Loss of ROM*

Petitioner's ROM was assessed multiple times after her vaccination, with varying results observed. Petitioner had multiple treater visits where she was documented having normal range of motion in her right shoulder. Ex. 3 at 4, 9, 13 ("patient has full active range of motion" during August 28, 2018, November 15, 2018, and February 5, 2019, provider visits). But there are also visits where Petitioner experienced a reduction in her right shoulder range of motion. Ex. 2 at 143 (noting external rotation active range of 60 degrees); Ex. 3 at 17 (finding restricted range of motion during April 9, 2019, provider visit).

Dr. Cagle disputed that Petitioner documented limited range of motion was caused by a shoulder injury, and opined this phenomenon was caused by Petitioner herself when she immobilized her right shoulder with a sling. Cagle Rep. at 12–13. He contended that immobilization can cause joint stiffness, but this does not explain many questions his assertion raises (such as how long the joint must be immobilized for to show a reduction in range of motion, whether sporadic sling usage would be sufficient to limit her range of motion, or whether a sling causes range of motion reduction or simply speeds up/exacerbates the reduction that a shoulder injury caused).

In addition, there is no evidence other than temporal association to causally connect the sling to the reduction in range of motion. It is well documented in the Program that *post hoc ergo*

*propter hoc* arguments cannot to establish causation on their own, nor do they offer substantial weight to a causal theory. *Wyble v. Sec'y of Health & Hum. Servs.*, No. 23-12V, 2026 WL 822766, at *24 (Fed. Cl. Spec. Mstr. Feb. 27, 2026) (explaining that *post hoc ergo propter hoc* evidence is given low weight in Program cases); *Moberly,* 592 F.3d at 1323–24 (concluding that a showing of temporal association between vaccination and injury, together with the absence of another identified cause, is insufficient to establish causation); *Fair v. Sec'y of Health & Hum. Servs*., No. 90-1784V, 1993 WL 80491, at *7 (Fed. Cl. Spec. Mstr. Mar. 8, 1993) ("The court cannot subscribe to the thesis of post hoc, ergo proper hoc as a basis for finding causation-in-fact."). The same goes for this somewhat speculative contention.

Furthermore, the time when range of motion reductions occur post-vaccination does not preclude a finding in favor of satisfying SIRVA QAI three. The Table does not require that a petitioner's reduced range of motion be shown to have occurred within 48 hours—or even within any specified timeframe. *See* 42 C.F.R. § 100.3(c)(10)(i)-(iv); *Portee v. Sec'y of Health & Hum. Servs*., No. 16-1552V, 2018 WL 5284599, at *8, 11 (Fed. Cl. Spec. Mstr. Sep. 14, 2018). Rather, the QAI language only requires that the Petitioner suffers range of motion loss *sometime* after vaccination in addition to pain—which Petitioner has done in this case. At most, the documented limited range of motion occurring months after vaccination goes towards the mild intensity of Petitioner's SIRVA and will be considered while determining damages.

*Pain and Range of Motion Issues Limited to Affected Shoulder*

This record incudes complaints of pain or symptoms outside of the area of Petitioner's shoulder—but again, there is enough evidence of primary shoulder-oriented concerns to find on this issue in Petitioner's favor. Admittedly, Petitioner did list complaints of neck pain, neck tenderness, neck spasms, an inability to twist her wrist and forearm, shoulder blade pain and burning, and whole arm heaviness. Ex. 2 at 110, 185, 200. But Petitioner continuously tied her pain to her shoulder and vaccine, and shoulder complaints came to predominate Petitioner's treatment. *Id.* In addition, there was no evidence of range of motion limitations to Petitioner's neck, or other nonaffected areas, such as the left shoulder, torso, legs, etc.

Dr. Kuhn's explanation for why Petitioner experienced adjacent muscular group symptoms were largely persuasive. Based upon his treatment of SIRVA and shoulder injury patients, Dr. Kuhn opined that individuals sometimes feel pain in and around the shoulder. *See* Third Kuhn Rep. at 3. Individuals may also over-rely on adjacent muscular regions (arm, neck, elbow) to compensate for their pain and loss in range of motion in the shoulder. *See id.* at 2. Even Dr. Cagle acknowledges that compensatory muscle use that develops into pain happens in shoulder injury patients with time. Cagle Rep. at 11. I therefore find that Petitioner has preponderantly shown that her pain and ROM limitation was sufficiently isolated to her left shoulder. (Again, however, these

kinds of secondary symptoms will not factor into damages, to the extent treatment went more to them or reflects unrelated issues).

*Lack of Previous Right Shoulder Pain, Injury, and Dysfunction*

Respondent does not outwardly challenge this SIRVA QAI requirement in his Opposition Brief, but continues to assert that Petitioner had a pre-vaccination chronic degenerative neck pathology. *See* Opp. at 14–17. This is evidenced by Petitioner's slip and fall in 2017 that affected her neck and post-vaccination imaging results that showed a degenerative process that had progressed to the point where treating providers had recommend surgery. *Id.* at 16. However, there is no history of reported medical evidence of pain, inflammation, and dysfunction in her right shoulder from 2017 to the spring of 2018 that would explain the post-vaccination injury. Accordingly, I find that Petitioner has established this requirement for his Table SIRVA claim.

*No Other Condition or Abnormality is Present that can Fully Explain Petitioner's Symptoms*

Petitioner must also affirmatively rule out other explanations for his pain and related deficiencies. *See* 42 C.F.R. § 100.3(c)(10)(iv). This element of Petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Hum. Servs*., 175 Fed. Cl. 673, 680 (2025). However, while the another "condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Hum. Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sep. 27, 2023). Indeed, a petitioner may fail to meet this requirement where there is clinical evidence of an undiagnosed alternative condition. *Durham v. Sec'y of Health & Hum. Servs*., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

Respondent does not defeat a Table SIRVA claim by simply noting the presence of a neck dysfunction beyond vaccine injury. *See Grossmann v. Sec'y of Health & Hum. Servs*., No. 18-13V, 2022 WL 779666, at *16 (Fed. Cl. Spec. Mstr. Feb 15, 2022). Alternative explanations based on conditions or abnormalities intrinsic to the shoulder raise the complex issue of whether Petitioner's "clinical history shows h[is] shoulder pathology wholly explains h[is] symptoms independent of vaccination." *See Lang v. Sec'y of Health & Hum. Servs*., No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020); *see also, Molina v. Sec'y of Health & Hum. Servs*., No. 20-845V, 2024 WL 4223393, at *8 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (finding that petitioner's diagnosis of calcific tendinitis precluded a Table SIRVA under the fourth SIRVA criterion because it is "a condition that can in itself present with acute onset of shoulder pain"). Ultimately, where the presence of another condition is apparent, a petitioner bears the burden of proving that the condition nonetheless "would not explain" her symptoms. *Durham*, 2023 WL 3196229, at *14.

Here, Petitioner has met her burden of proof for this element. First, Petitioner received diagnostic tests that were negative for other causes that would explain her symptoms. Second, Petitioner's post-vaccination diagnoses are not a more likely cause for her shoulder pain, but actually may indicate a SIRVA. Over the course of her treatment, Petitioner was diagnosed with subdeltoid bursitis, partial rotator cuff tear, small bursal effusion, and degenerative neck changes. Rotator cuff tears are not attributable to SIRVA, but assuming this was a pre-vaccination tear, it was asymptomatic as there is no record of prior right shoulder pain. Similarly, if Petitioner's degenerative neck changes occurred prior to vaccination (which there is no record of that being the case), they were also asymptomatic, or at least did not cause Petitioner any symptoms or pain. Petitioner's subdeltoid bursitis and small bursal effusion are likely indicators of a discrete shoulder injury, as post-vaccination SIRVA patients can experience inflammation and excess fluid buildup in their shoulder that decreases with time. The scholarly literature submitted in this matter supports an initial, post-vaccination buildup of fluid and inflammatory changes that decreases over time. *See* Cagle 2020 at 301. Since Petitioner received her first MRI roughly three months after her vaccination, it is likely that this buildup decreased in Petitioner.

Third, Petitioner's comorbid pathologies do not wholly explain her symptoms independent of vaccination—specifically, Petitioner's continuous shoulder pain from vaccination and documented range of motion loss within twelve months. While Respondent argues that degenerative neck changes could account for her pain, there is not sufficient record evidence to support this theory.

Program determinations frequently find that a SIRVA has been established even when it occurs concurrent with symptoms attributable to preexisting degenerative shoulder issues that were subclinical prior to the offending vaccination. And this case's record can support such a finding. The evidence of SIRVA in this case is met, along with other documented problems of subdeltoid bursitis, partial rotator cuff tear, small bursal effusion, and degenerative neck changes. While these later comorbidities (which cannot be attributed to the SIRVA) are relevant to damages, they do not impact Petitioner's success in this case of demonstrating a Table SIRVA.

*Petitioner's Symptoms Sequelae Persisted for More than Six Months After Onset*

To satisfy the Act's "severity requirement," a petitioner must show by a preponderance that they "suffered the residual effects or complications of [the alleged injury] for more than 6 months." Vaccine Act § 300aa-11(c)(1)(D)(i); *see Wright v. Sec'y of Health & Hum. Servs.*, 22 F.4th 999, 1002 (Fed. Cir. 2022); *Wagner v. Sec'y of Health & Hum. Servs.*, No. 17-1388V, 2019 WL 3297509, at *5 (Fed. Cl. Spec. Mstr. May 8, 2019). The Vaccine Act's severity requirement goes only to the *persistence* of pain, not its intensity. *See* Vaccine Act § 11(c)(1)(D)(i). "[E]ven mild symptoms that do not require medical care may satisfy the severity requirement," but

"ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not." *Wagner*, 2019 WL 3297509, at *5.

The record in this case establishes six months of post-onset residual effects. From the date of Petitioner's vaccine in April 2018, Petitioner spent over a year and a half consistently presenting to providers with right shoulder pain and seeking treatment. During this time, she endured multiple doctor's visits, injections, and testing/imaging for her right shoulder. Further, after a break in treatment, there is evidence of Petitioner seeking treatment for pain in her right shoulder in November of 2021 (roughly three and a half years later).

## CONCLUSION

Although Petitioner has prevailed in carrying her entitlement burden, it is very evident from the facts of this case that damages should be modest. Her SIRVA was mild in character. She did not experience range of motion loss for months after her vaccination, she had existing comorbidities, she did not undergo surgery but was given multiple corticosteroid injections and underwent some physical therapy. Petitioner should therefore expect overall to receive (in addition to any SIRVA-related unreimbursed treatment costs) a very moderate pain and suffering award—certainly not in the six figures, and perhaps no higher than the middle five figures at best.

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. The parties shall attempt to resolve damages, and shall file a settlement status report on their progress on or before August 31, 2026.

**IT IS SO ORDERED.**

s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master